IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT HUNTINGTON

DAVID IVAN JAMES,

        Plaintiff,

V.                          CIVIL ACTION NO. 3:06-0457

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

## MEMORANDUM ORDER

      In this action, filed under the provisions of 42 U.S.C. §§ 405(g) and 1383(c)(3), plaintiff seeks review of the final decision of the Commissioner of Social Security denying his applications for disability insurance benefits and supplemental security income based on disability. The case is presently pending before the Court on cross-motions of the parties for judgment on the pleadings.

      Plaintiff protectively filed his applications on October 8, 1996, alleging disability commencing September 28, 1996,[1] as a consequence of a knee injury, right hand injury, and "slow learner, nerves." On appeal from initial and reconsidered denials, an administrative law judge, after hearing, found plaintiff not disabled, in a decision which became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review. Thereafter, he filed a civil action seeking review of the Commissioner's decision. This Court, perceiving deficiencies,

---

[1] Plaintiff's insured status expired June 30, 1999, and, for purposes of his application for disability insurance benefits, it was incumbent upon him to establish disability on or before that date. Harrah v. Richardson, 446 F.2d 1, 2 (4th Cir. 1971).

remanded the case to the Commissioner for further proceedings.[2] Following a supplemental hearing, the administrative law judge again found plaintiff not disabled. This decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review.[3] Thereafter, plaintiff filed this action again seeking review of the Commissioner's decision.

At the time of the most recent administrative decision, plaintiff was forty-four years of age and had obtained a high school education. He has no past relevant employment experience. In his decision, the administrative law judge found that plaintiff suffered from "right tibeal [sic] plateau fracture with subsequent surgery and concomitant mild degenerative changes of the right knee; fracture of the fifth finger of the right hand with subsequent malunion and deformity; back pathology; borderline intellectual functioning; and alcohol and polysubstance dependency," impairments he considered severe. Concluding that, at all times relevant to his applications, plaintiff retained the residual functional capacity for a limited range of sedentary level work, and relying on Rule 201.24 of the medical-vocational guidelines[4] and the testimony of a vocational expert, he found plaintiff not disabled.

From a review of the record, it is apparent that substantial evidence supports the Commissioner's decision. Plaintiff testified that he took all special education classes in school and had to repeat the eleventh grade. I.Q. scores obtained during a consultative examination on January 14, 1997, revealed borderline intellectual functioning and limited literacy. Though plaintiff tried to

---

[2] See, Civil Action No. 3:99-0104.

[3] The administrative law judge's decision was dated November 20, 2001; however, the Appeals Council did not enter its order denying review until April 19, 2006. There has been no explanation offered for this significant delay.

[4] 20 C.F.R. Part 404 Subpart P, Appendix 2, Table No. 1.

2

downplay his ability to read, as the administrative law judge noted, he admitted to taking a written driver's test, and he took classes in heating and air conditioning system installation and repair which required some degree of textbook reading and written tests. The administrative law judge found that plaintiff had a low level of literacy but was not functionally illiterate, and the evidence supports this finding.

Plaintiff's medical history is significant for a fracture of the right knee in September 1996 while playing football with friends. Dr. Kyle Hegg, who performed surgery on the knee following this accident, noted that the bone could not be constructed back to normal. In February 1997, this physician noted an X-ray showed the fracture had healed "nicely," and plaintiff had "essentially" full range of motion and "excellent" stability of the knee, though there was a moderate amount of crepitus. Plaintiff was noted to be complaining of continued pain as well as an inability to return to heavy activity, such as construction work, and Dr. Hegg explained to him he would not be able to return to these types of activities.

Plaintiff was dismissed from treatment after the February 1997 visit, but he returned on May 13, 1997, again complaining of knee pain and functional limitation. Other than the crepitus, there were no abnormalities detected. Dr. Hegg explained that the type of fracture plaintiff sustained causes a form of post-traumatic osteoarthritis to develop. He offered an injection but plaintiff refused and Dr. Hegg advised him again to engage in lighter activities.

The record does not document any treatment for knee pain after 1997. On December 14, 2000, during a consultative evaluation with Dr. Mehta, plaintiff related he was taking no medication. He complained of pain in all of his joints but especially his back and right knee. Exam revealed plaintiff could sit comfortably for part of the time and had a normal gait. While Dr. Mehta did not

observe any evidence of swelling or deformity of joints in the elbows, wrists, hands, knees, hips or spine, he did detect limited range of motion in the right knee and hip and 4/5 muscle strength in the right lower extremity. Despite these findings, he determined that plaintiff would have no limitations on standing/walking or sitting and would be limited only to occasional climbing, balancing and stooping.

Plaintiff has been treated for fractures of bones in the right little finger and the right thumb. As the administrative law judge found, however, the evidence does not establish limitations resulting from these problems. Plaintiff fractured the fifth metacarpal on the right hand in October 1995 but did not seek medical attention until April 1996 when he began experiencing some weakness and pain. X-rays showed malunion of the fracture with weakness secondary to disuse. On referral from his treating physicians, plaintiff was examined by Dr. Bolano, an orthopedic surgeon, on June 5, 1997. After reviewing X-rays and examining the finger, Dr. Bolano was of the opinion that plaintiff's pain was "mild." He indicated that surgery would be appropriate only if the pain were moderate to severe and plaintiff was having "significant difficulty" with daily activities. It does not appear plaintiff returned to see this physician until April 10, 2000, when he complained of having fallen on his right thumb the week before. He also complained of continued pain in the little finger but told a different story about how the fracture occurred.[5] Dr. Bolano observed mild deformity of part of the fifth finger without tenderness or instability. There were no range of motion abnormalities of any of the fingers, but the thumb was swollen and quite tender. A cast was placed on it and removed four weeks later as plaintiff was "doing well without any significant problems."

---

[5] Plaintiff originally reported he had hurt this finger during an altercation; however, on this date he told Dr. Bolano he was working on a car and one of the tools slipped and struck him on the hand causing the fracture.

On June 19, plaintiff had good range of motion of the thumb with a "little bit" of stiffness but good alignment and function. Though plaintiff continued to voice complaints of pain in the little finger, Dr. Bolano was of the opinion that surgery would not significantly decrease the pain and recommended plaintiff "learn to live with his mild discomfort."

During a consultative exam on December 14, 2000, Dr. Mehta noted plaintiff complained of pain located in his low back and right knee. He denied numbness or tingling in the legs and reported the pain was not increased with coughing, sneezing or other abdominal movements. This physician recorded right hand grip strength as 3/5 and left as 5/5; however, he noted no functional limitations related to this finding, and none of the other examiners or treating physicians observed problems with right hand use during exam or on psychological testing.

Dr. Brownfield diagnosed plaintiff with fibromyalgia after observing tenderness in the paraspinal muscles and stiffness with walking. He noted that it was his policy not to prescribe narcotics on a regular basis so he gave plaintiff a trial of antidepressant medication. When this failed, he prescribed a muscle relaxant which plaintiff reported in December of 1997 had helped him sleep better. He was not then taking pain medication because he had failed to follow-up with Dr. Daniels, the treating physician who had prescribed it. Plaintiff also did not follow-up on his referral to a pain clinic. Dr. Brownfield stated he had nothing further to offer plaintiff other than a referral to a fibromyalgia support group. Despite his diagnosis of this condition, Dr. Brownfield's notes, which appear to cover only four visits, do not contain any objective findings in support of the diagnosis of fibromyalgia and there is clearly no support for his October 13, 2000, note, written at plaintiff's request, that plaintiff was "unable to be gainfully employed."

When Dr. Mehta evaluated plaintiff in December 2000, he noted plaintiff's complaints of pain in most of his joints, especially the back and right knee. As noted, objectively, he found limited range of motion in the knee, the right hip and the lumbar spine as well as "very mild" weakness in the right lower extremity which did not affect plaintiff's gait or ability to stand on his heels or toes or to walk heel-to-toe, although he could not squat. Range of motion was also limited in the right shoulder, but Dr. Mehta did not find it would limit plaintiff's ability to reach.

Plaintiff has been prescribed medication for anxiety and depression but has not been seen by a mental health professional other than the examiners to whom he was sent by the Commissioner. In January 1997, he received a diagnosis of major depressive disorder, single episode, moderate, panic disorder without agoraphobia, borderline intellectual functioning, and alcohol dependence, sustained partial remission.[6] The Commissioner had plaintiff evaluated a second time by Lisa Tate, M.A., on December 11, 2000. Plaintiff reported having a hangover and did not feel well. He smelled "very strongly" of alcohol and admitted having drunk twelve beers the night before. He related he typically drank two to three times a week, sometimes moderately and sometimes more heavily. Ms. Tate diagnosed alcohol dependence, panic disorder without agoraphobia, depressive disorder not otherwise specified and borderline intellectual functioning.[7]

The administrative law judge concluded that no mental impairment other than polysubstance abuse was established.[8] He based this finding on evidence that plaintiff has a lengthy alcohol abuse

---

[6] Despite this diagnosis, plaintiff told this examiner he was still drinking daily but at a level (three beers) that he claimed was not causing him any problem.

[7] I.Q. scores obtained during this exam were considered invalid.

[8] He also found that borderline intellectual functioning was present.

history but did not have any periods of sobriety long enough to determine whether he had an independent mental impairment. Plaintiff did not object to this finding in his brief.

After reviewing the evidence, the administrative law judge concluded that the residual functional capacity from Dr. Mehta was the most consistent with the evidence and thus found plaintiff capable of only sedentary level work which required no prolonged walking. He also found plaintiff could never crouch, kneel, crawl or squat, and only occasionally climb, balance or stoop. He further found plaintiff had a "low level of literacy (at least seventh grade reading ability)[9] and, as a result, would have a "fair" ability (limited but satisfactory) to understand, remember and carry out complex or detailed instructions. The administrative law judge rejected the state agency medical advisors' opinions that plaintiff was not limited at all. The only treating physician comment in this regard was in an October 13, 2000, report from Dr. Brownfield wherein he noted plaintiff had requested a statement about his condition "for disability." He then opined that plaintiff had fibromyalgia and was "unable to be gainfully employed," as previously noted. While Dr. Brownfield is a treating physician, this statement is vague, does not refer to any objective or clinical findings, and is not consistent with this doctor's notes or with the rest of the evidence.[10] Though the administrative law judge may have overlooked this comment, it is apparent that it is not supported by either treatment notes or other evidence. The Court concludes the administrative law judge's residual functional capacity findings are supported by substantial evidence.

---

[9] The vocational expert testified that the average person would need a seventh grade reading ability to be able to pass the written driver's license exam.

[10] See, 20 C.F.R. §§404.1527(d)(2), 416.927(d)(2).

While plaintiff complained of significant limitations on his activities mainly due to pain, the administrative law judge, taking account of the evidence as well as his observations of plaintiff at the hearing, found his credibility to be "poor." In making this finding, he noted a number of inconsistencies between plaintiff's testimony and reports to various medical personnel, as well as between his allegations and the objective evidence. In particular, plaintiff alleged he could barely read but was able to complete a course in heating and air conditioning installation and repair, as well as take the written exam to obtain his driver's license. His reports concerning his drinking are also in conflict. Numerous other examples were cited by the administrative law judge as well as objective evidence which did not support plaintiff's allegations. In view of the evidence, and taking account of the administrative law judge's "opportunity to observe the demeanor and to determine the credibility of the claimant," these findings are entitled to "great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984).

A vocational expert was present at the hearing and provided testimony in response to hypothetical questions. Plaintiff asserts that these questions were deficient and that the jobs cited by this witness are not at the sedentary level. Initially, plaintiff contends that the hypothetical questions should have included limitations relative to fractures of the thumb and fifth fingers of the right hand. As noted, there were no limitations on the use of this hand detected during treatment or examinations. Dr. Bolano characterized plaintiff's pain as "mild" in the little finger, and there were no residual problems after the thumb fracture healed. Review of the administrative law judge's hypothetical questions reveals they did "fairly set out all of [plaintiff's] impairments." Walker v. Bowen, 889 F.2d 47, 50-51 (4th Cir. 1989).

Plaintiff also contends that there were conflicts between the vocational expert's testimony and the Dictionary of Occupational Titles ("DOT") which the administrative law judge did not resolve in accordance with Social Security Ruling ("SSR") 00-4p. This ruling provides that when a vocational expert testifies about the requirements of a job, the adjudicator has "an affirmative responsibility" to ask whether there is any possible conflict between this testimony and information in the DOT. If a conflict is acknowledged by the vocational expert or is otherwise apparent, the adjudicator is to obtain a "reasonable explanation" for it.

In this case, the vocational expert testified that, consistent with the hypothetical question, plaintiff could perform four sedentary level jobs - hand packer, food preparation work such as sandwich and salad maker, grading and sorting types of jobs and price marker jobs. The administrative law judge asked the vocational expert whether there were any conflicts between these jobs and the DOT, and this witness assured him there were none. Plaintiff now asserts, however, that none of the jobs cited is classified as sedentary.

Unfortunately, neither the administrative law judge nor plaintiff's counsel asked the vocational expert to provide DOT numbers for the jobs he cited. In a brief to the Appeals Council, Plaintiff did list some jobs in these categories, and, as he asserts, they were all exertionally greater than the sedentary level. In his brief, the Commissioner directs the Court to two sedentary "pricer" jobs which he asserts are equivalent to the price marker type jobs mentioned by the vocational expert. These jobs, pricer for a message and delivery service, DOT #214.467-014, and laundry pricing clerk, DOT #216.482-030, are listed as sedentary in exertion and appear to meet the other requirements of the hypothetical question. While these jobs represent only one of the types of jobs about which the vocational expert testified, 20 C.F.R. §§404.1567(b) and 416.967(b) provide that

9

"[w]ork exists in the national economy when there is a significant number of jobs (in <u>one</u> or more occupations) having requirements which [a claimant is] able to meet" with his or her physical or mental abilities and vocational qualifications. (Emphasis added.) In light of this evidence, and noting that plaintiff has not challenged to the Commissioner's assertions, the Court concludes that the jobs noted by the Commissioner satisfy his burden of production and, therefore, remand for clarification from the vocational expert is unnecessary.

Resolution of conflicts in the evidence is within the province of the Commissioner, not the courts, <u>Thomas</u> v. <u>Celebrezze</u>, 331 F.2d 541 (4th Cir. 1964), and if the Commissioner's findings are supported by substantial evidence this Court is bound to uphold the decision. <u>Blalock</u> v. <u>Richardson</u>, 483 F.2d 773, 775 (4th Cir. 1972). In the present case, the evidence, though conflicting, provides substantial support for the Commissioner's findings with respect to plaintiff's impairments, residual functional capacity and ability to perform alternate employment. Under such circumstances, the decision of the Commissioner must be affirmed.

On the basis of the forgoing, it is **ORDERED** that plaintiff's motion for judgment on the pleadings be denied, that the like motion of defendant be granted and the decision of the Commissioner be affirmed. All matters in this case being concluded, it is **ORDERED** dismissed and retired from the Court's docket.

The Clerk is directed to transmit a copy of this Memorandum Order to all counsel of record.

ENTER: May 8, 2009

_____
MAURICE G. TAYLOR, JR.
UNITED STATES MAGISTRATE JUDGE